UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

JOEL BABULAL,
    a/k/a "Joel Nical Babulal,"
    a/k/a "Mark Khan,"

                Defendant.

**25 Cr. 310 (CS)**

---

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

 

JAY CLAYTON
United States Attorney
Southern District of New York

Reyhan Watson
John Sarlitto
James McMahon
Assistant United States Attorneys
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 3

ARGUMENT............................................................................................................................. 5

I.     The Court Should Allow the Admission of Certain Evidence ........................................... 5

     A.     Applicable Law.................................................................................................... 5

          1.     Direct Evidence........................................................................................ 5

          2.     Rule 404(b) .............................................................................................. 6

          3.     Rule 403 .................................................................................................. 7

          4.     Rule 801(d)(2)(E)..................................................................................... 7

     B.     Discussion ........................................................................................................... 9

          1.     Tameka Babulal's USPS Employment Application Statement Identifying "Mark Khan" as Her Former Supervisor Is Admissible ............................ 9

          2.     Tameka Babulal's and CC-1's Statements in Furtherance of the Conspiracy Should Be Admissible as Co-Conspirator Statements........... 11

               (a)     Tameka Babulal's False Statements to Jovia Credit Union .......... 12

               (b)     Communications Transmitting Victims' PII and Discussing Means of Carrying Out the Fraud Scheme ................................................. 12

               (c)     Fraudulent Credit Card Applications Submitted in Victims' Names ...................................................................................................... 13

          3.     Evidence of the Babulals' Mail Theft and Identity Theft Occurring Before and After the Charged Timeframe Is Admissible..................................... 14

          4.     The Court Should Admit Limited Evidence of Tameka Babulal's Extramarital Affair to Provide Context for Joel Babulal's Actions .......... 17

          5.     Evidence of Joel Babulal's Prior COVID-19 Unemployment Benefits Application and Subsequent Payments Is Admissible ............................. 20

          6.     The Court Should Admit Evidence of Joel Babulal Taking Pictures and Videos of Substantial Sums of Cash in 2020 ....................... 21

          7.     The Court Should Admit Evidence of Joel Babulal Taking Pictures and Videos of Substantial Sums of Cash in 2022 ....................... 23

II.     The Court Should Preclude the Defendant from Introducing Evidence and Arguments that Are Irrelevant and Unfairly Prejudicial ................................................................. 25

i

A.      The Court Should Preclude Any Evidence or Argument about the Government's Charging Decisions or Evidence that Tameka and Joel Were Not Charged at the Same Time ......................................................................................................... 25

B.      The Court Should Preclude Any References to Joel Babulal's Potential Punishment, Including His Immigration Status or Immigration Consequences if He Is Convicted ...................................................... 28

C.      The Court Should Preclude Any Reference to Counsel's Presence at the November 1, 2024 Innocence Proffer ......................................... 30

III.   The Court Should Admit into Evidence Certified Records that Are Admissible and Self-Authenticating ................................................................................................................ 31

A.      Applicable Law .................................................................................................. 31

1.      Rules 902(11) and 803(6) ........................................................................... 31

2.      Rule 902(13) ............................................................................................... 32

3.      Rule 902(14) ............................................................................................... 33

B.      Discussion .......................................................................................................... 33

CONCLUSION ......................................................................................................................... 35

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motions *in limine* in advance of the trial of defendant Joel Babulal, which is scheduled to begin on July 16, 2026. As set forth below, the Government moves *in limine* on three categories of issues: first, the admission of evidence that is direct proof of the charged conspiracy and false-statement counts, or alternatively admissible under Rule 404(b); second, the preclusion of irrelevant and unfairly prejudicial defense arguments; and third, the admission of business records and electronic evidence through self-authenticating certifications.

*First*, the Government seeks an order admitting evidence that proves the charged mail-theft, identity-theft, fraud, and false-statement offenses, which will serve to tell the complete story of the charged conspiracies and rebut the anticipated defense that Joel Babulal was merely an uninformed spouse. This evidence includes the admission of:

- Tameka Babulal's USPS employment application statement identifying "Mark Khan" as her former supervisor and listing the phone number of "Mark Khan" as one ending in 8717, which was also used in furtherance of the charged conspiracies;

- Statements by Tameka Babulal and other co-conspirators made during and in furtherance of the charged conspiracies pursuant to Rule 801(d)(2)(E);

- Evidence of the Babulals' identity-theft and fraud conduct during the charged period, as well as relevant, closely related conduct before or after the charged timeframe;

- Limited evidence of Tameka Babulal's extramarital affair and how Joel Babulal's response to it ties in to the Government's proof of the charged offenses;

- Limited evidence of Joel Babulal's application and certifications for federal and state COVID-19 unemployment benefits and subsequent benefits payments received by him, including evidence linking him to a phone number used in the fraud scheme (the 8717 phone number) and the "Mark Khan" identity; and

- Videos and photographs of substantial sums of cash, which were created by Joel Babulal in 2020 and 2022.

*Second*, the Government seeks an order precluding defense arguments and evidence that are irrelevant to guilt or innocence, would confuse the issues, or would invite the jury to consider improper issues. Specifically, the Court should preclude evidence or argument concerning:

- The Government's charging decisions or prosecutorial motives, including the facts that Tameka Babulal and Joel Babulal were not charged at the same time and other suspected participants have not been charged.

- The potential consequences of Joel's conviction, including any references to his immigration status or potential immigration consequences.

- The involvement of the parties' trial counsel at Joel Babulal's November 1, 2024 innocence proffer.

*Third*, the Government seeks an order admitting, absent stipulations, records and electronic evidence through self-authenticating certifications and other proper foundations under the Federal Rules of Evidence. Specifically, the Government seeks an order admitting business records under Rules 803(6) and 902(11), certified electronic records generated by electronic processes under Rule 902(13), and certified data copied from electronic devices, storage media, or files under Rule 902(14).

## FACTUAL BACKGROUND

From approximately July 2021 through May 2024, Tameka Babulal ("Tameka") was employed by the United States Postal Service as a mail carrier in Mount Vernon, New York. Rather than deliver the mail entrusted to her, Tameka used her USPS position to steal mail and participate in a broader fraud scheme with her husband Joel Babulal ("Joel") and others. The stolen materials included checks, credit cards, personal identifying information, financial-institution mail, and other mail matter intended for delivery to victims on Mount Vernon mail routes.

The Government expects the evidence will show that the Babulals used their shared residence in Hempstead, New York (the "Marital Residence")—and, in particular, their shared bedroom—as a storage and operating location for the scheme. When law enforcement searched that residence, agents recovered, among other things, bundles of mail, a postal mail bin, packages, dozens of credit cards in other people's names, dozens of checks to and from other people, washed checks, multiple Social Security cards in other people's names, and other identity and financial documents. Nearly all those materials were found in the bedroom Joel shared with Tameka.

The Government also expects to prove that Tameka and Joel agreed with each other and with others to steal, receive, conceal, and unlawfully possess mail, and to use stolen mail and victim information to commit fraud. In furtherance of those agreements, Tameka stole checks, credit cards, and identifying information from the mail; transported stolen mail and mail contents to the Marital Residence; photographed stolen checks and mail; obtained and exchanged victims' personal identifying information through electronic communications; attempted to use stolen cards through Cash App; used victims' identities to open or attempt to open financial accounts; and stored stolen mail, credit cards, checks, and identity materials in the Marital Residence.

3

The fraud scheme targeted victims on Tameka's Mount Vernon mail route, as well as banks, card issuers, and other financial institutions. Among other things, the Government expects to prove that Tameka attempted to deposit fraudulent checks into personal accounts in her name and, when the financial institution questioned the deposits by email, falsely claimed that the checks were legitimate.

The evidence will further show that the Babulals and their co-conspirators attempted to use stolen credit cards and victim identities for personal gain. They attempted to link stolen cards to Cash App accounts, including accounts in Joel Babulal's and Tameka Babulal's own names and accounts fraudulently created in victims' names, and then attempted to pull funds from those cards. They also obtained victims' names, dates of birth, Social Security numbers, addresses, and account information, and used that information to submit fraudulent applications for credit cards and other financial accounts. Those applications and attempted transactions involved the identities of real people, including victims who lived on Tameka's Mount Vernon mail routes.

The evidence will also show that although the conspirators used cash and other methods to avoid having fraudulent activity tied to their names, the Babulals also used accounts, devices, phone numbers, and aliases attributable to them. They also operated their mail theft and fraud scheme out of their shared bedroom.

Finally, the Government expects to introduce evidence concerning the "Mark Khan" alias and the phone number ending in 8717. On Tameka's USPS employment application, she falsely listed "Mark Khan" as a former supervisor and provided a contact phone number ending in 8717. Joel Babulal and Tameka Babulal also used the 8717 number to further the fraud, including, for example, by using it on applications for fraudulent credit cards. The Government expects to prove that the 8717 number was used by Joel, that a phone assigned that number was found in the marital

4

residence, and that "Mark Khan" was an alias used by Joel, including in connection with online purchases and a social-media account that the Government expects to prove Joel used based on content obtained from the relevant service provider. That evidence is relevant not only to how Tameka obtained the USPS position that enabled the mail theft, but also to Joel's later false statements denying his use of the "Mark Khan" alias and the 8717 number to exculpate himself during an innocence proffer.

## ARGUMENT

### I.    The Court Should Allow the Admission of Certain Evidence

#### A.    Applicable Law

##### 1.    Direct Evidence

Relevant evidence is generally admissible at trial. Fed. R. Evid. 402. Actions and statements are admissible as direct evidence of the crimes charged, and are not considered other-crimes evidence under Federal Rule of Evidence 404(b) if they (a) "arose out of the same transaction or series of transactions as the charged offense," (b) are "inextricably intertwined with the evidence regarding the charged offense," or (c) are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007). Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *accord United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

Where, as here, an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged."

5

*United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (explaining that "uncharged acts may be admissible as direct evidence of the conspiracy itself"). It is a "fundamental tenet of the law of conspiracy" that a defendant can be held criminally liable for the reasonably foreseeable acts of his co-conspirator, even if he did not himself participate in the substantive crime. *United States v. Bala*, 236 F.3d 87, 95 (2d Cir. 2000); *see also United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (A "defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement") (internal quotations omitted). "Whether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury." *United States v. Bruno*, 873 F.2d 555, 560 (2d Cir. 1989).

### 2. Rule 404(b)

Evidence of a defendant's prior crimes, wrongs, or acts is admissible under Rule 404(b) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Indeed, other acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

The Second Circuit follows an "inclusionary approach" under which "prior act evidence is admissible for any purpose other than to show a defendant's criminal propensity." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017). Such evidence is admissible if it is (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v.*

*Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990). Other act evidence is routinely admitted "to inform the jury of the background of the conspiracy charged, in order to explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Dupree*, 870 F.3d at 76 (citing *Diaz*, 176 F.3d at 79).

### 3.    Rule 403

Whether evidence is admitted as direct evidence or under Rule 404(b), the probative value of such evidence must not be "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence of uncharged acts does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant is] charged." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (internal quotations omitted). To the extent there is any risk of unfair prejudice from otherwise probative evidence, a court may provide limiting instructions to remind the jury that the defendant is not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice); *see generally United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.").

### 4.    Rule 801(d)(2)(E)

Federal Rule of Evidence 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement under this rule, a court must find by a preponderance of the evidence that: (1) a conspiracy that included the

7

defendant and the declarant existed; and (2) the statement was made during the course of, and in furtherance of, that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). When determining whether the predicate conspiracy has been established, a court is not bound by the Rules of Evidence, *see* Fed. R. Evid. 104(a), and "may consider the hearsay statement itself" as evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).

For a statement to be in furtherance of a conspiracy, the statement "must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they, among other things: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, *Diaz*, 176 F.3d at 87; or (7) inform a co-conspirator of "the identity and activities of his

coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987). A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy." *Thai*, 29 F.3d at 813; *see also Desena*, 260 F.3d at 159; *Maldonado-Rivera*, 922 F.2d at 958; *United States v. Flaharty*, 295 F.3d 182, 199–200 (2d Cir. 2002).

### B.    Discussion

#### 1.    Tameka Babulal's USPS Employment Application Statement Identifying "Mark Khan" as Her Former Supervisor Is Admissible

The Government should be permitted to introduce evidence that, in July 2021, Tameka Babulal submitted an employment application to the Postal Service in which she falsely certified that she previously worked at a restaurant under a supervisor named "Mark Khan" and provided a contact phone number for "Mark Khan" ending in 8717. Tameka Babulal pleaded guilty to one count of making a false statement under Section 1001 arising from those statements. The Indictment alleges that Joel Babulal used "Mark Khan" as an alias and charges Joel with a Section 1001 violation for falsely denying, among other things, that he used the name "Mark Khan" and that he used the phone number ending in 8717. This evidence is admissible against Joel for several independent reasons.

The evidence is not hearsay, because it is not offered for its truth. The Government does not offer the USPS application statement to prove that "Mark Khan" actually supervised Tameka at a restaurant. Instead, the Government intends to offer the statement on the employment application because it was made and because the evidence will show it was false.

The evidence is relevant.  It is directly probative of the offense charged in Count Nine, which alleges that Joel falsely denied using the name "Mark Khan," falsely denied using the phone number ending in 8717, falsely denied knowing why the Instagram account "mark.khan.3192479"

9

was on his phone, and falsely denied purchasing Amazon packages shipped to "Mark Khan" at the Marital Residence. Tameka's USPS employment application helps prove those denials were false. It links the "Mark Khan" alias and Joel-associated phone number to Joel years before the interview with federal law enforcement in which Joel made material false statements.

Because the employment application connects the "Mark Khan" alias (and the 8717 number) to fraud and deception, it also establishes a motive for Joel's subsequent false denials, as well as consciousness of guilt with respect to the alias. Tameka's employment application is also relevant to the conspiracy and fraud counts because Tameka used Joel's alias and phone number in her application for the very job that gave her access to the mail used in the charged conspiracies and fraud scheme.

Even if the Court finds that the employment application is not admissible as direct evidence of the charged offenses, it would still be admissible under Rule 404(b). It shows the nature of the relationship between Joel and Tameka because it tends to prove that Tameka used Joel's alias and phone number in a formal USPS application, reflecting trust and coordination between them. The evidence rebuts the anticipated defense theme that Joel was merely a bystander to Tameka's crimes or an uninformed spouse with no knowledge of or involvement in her fraudulent conduct. *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (evidence may be admitted to explain "how the illegal relationship between participants in the crime developed" and "the mutual trust that existed between coconspirators"). The evidence also goes to Joel's knowledge, as it makes it more likely that Joel knew about the "Mark Khan" identity and its connection to Tameka's USPS employment. A job applicant who lists a prior supervisor reasonably anticipates that the employer may contact that supervisor. If an alias and a phone number used by Joel appeared on Tameka's application, Joel's later denials about "Mark Khan" are less likely to be innocent confusion and more likely to

10

be knowing falsehoods. As to absence of mistake, the evidence rebuts any claim that the "Mark Khan" alias, the 8717 number, the "Mark Khan" Instagram account, or the packages shipped to "Mark Khan" at the Marital Residence were accidental, coincidental, or unrelated to Joel.

Finally, Rule 403 does not warrant exclusion. This evidence is not inflammatory, confusing, or cumulative. It is a discrete application entry involving an alias and a phone number. It is also less sensational than the charged conduct, which involves stealing mail, possessing stolen mail, using victims' credit cards and identifying information, and making false statements to federal agents. The Second Circuit has explained that the Rule 403 prejudice inquiry focuses on unfair prejudice—not the ordinary prejudice that flows from probative evidence—and that the touchstone is whether the evidence is "more sensational or disturbing than the crimes with which [the defendant is] charged." *Roldan-Zapata*, 916 F.2d at 804; *see also Gelzer*, 50 F.3d at 1139. As discussed above, this evidence is highly probative and should be admitted.

### 2.    Tameka Babulal's and CC-1's Statements in Furtherance of the Conspiracy Should Be Admissible as Co-Conspirator Statements

The Government expects to prove that Joel Babulal was a member of a conspiracy that included, at a minimum, Tameka Babulal, Joel Babulal, and at least one additional co-conspirator who helped obtain, transmit, and use victims' personal identifying information ("CC-1"). The Government should be permitted to introduce statements made by Tameka Babulal, CC-1, and other co-conspirators during and in furtherance of the charged fraud conspiracy.

The statements described below are admissible under Rule 801(d)(2)(E) because they were made by Joel's co-conspirators during the conspiracy and were designed to "promote or facilitate achievement of the goals of that conspiracy." *Rivera*, 22 F.3d at 436.

### (a)     Tameka Babulal's False Statements to Jovia Credit Union

Tameka's December 28, 2022 statements to Jovia Credit Union are admissible co-conspirator statements. After two fraudulent checks totaling $4,150 were deposited into Tameka's Jovia account, Jovia asked Tameka where the checks came from. Tameka responded falsely that she had received the checks from the victim company as a "long term monthly payment" she had been "waiting for for the past 2 years" and that the checks had been sent to her "through PDF." Tameka made these statements to induce Jovia to accept or release the fraudulent deposits, to explain away Jovia's suspicions, and to prevent Jovia from detecting the fraud. Statements are in furtherance of a conspiracy when they "facilitate and protect" conspiratorial activity, *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999), or when they prompt a listener "to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958. Tameka's statements to Jovia did both: they sought to persuade the financial institution to process or preserve the fraudulent deposit and sought to avoid detection of the scheme.

### (b)     Communications Transmitting Victims' PII and Discussing Means of Carrying Out the Fraud Scheme

The Government should also be permitted to introduce communications in which Tameka and her co-conspirators exchanged victims' personal identifying information ("PII"), including Social Security numbers and other data attributes, as well as transaction confirmations and instructions about how to avoid detection. For example:

- On July 6, 2023, CC-1 transmitted a victim's PII to Tameka, including the victim's date of birth, Social Security number, address, and other possible names. The communication also included advice to "use cash" so that fraudulent activity would not be "attached to [Tameka's] name." Those statements are admissible because they instructed Tameka how to carry out and conceal the fraud going forward. It therefore

12

"reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy," and as "enhancing a co-conspirator['s] . . . usefulness to the conspiracy." *Tarantino*, 846 F.2d at 1412.

- On August 13, 2023, CC-1 transmitted another victim's PII to Tameka and asked whether she had "BTC" (*i.e.*, Bitcoin). The transmission of victim PII directly enabled the charged conspiracy, and the reference to Bitcoin shows that the members of the conspiracy were savvy to using difficult-to-trace financial payment methods to facilitate their fraud scheme.

- In September 2023, Tameka exchanged messages with CC-1 showing a "BTC" (*i.e.*, Bitcoin) cryptocurrency transaction confirmation and the transmission of a victim's PII, including the victim's date of birth, Social Security number, address, and other possible names. Such statements furthered the conspiracy because they directly enabled it.

### (c) Fraudulent Credit Card Applications Submitted in Victims' Names

The Government should also be permitted to introduce fraudulent credit card and account applications submitted in victims' names, including the August 25, 2023 Wells Fargo application in one victim's name and the September 13, 2023 Discover application in another victim's name, as well as other similar applications. Tameka submitted the Wells Fargo application using the victim's identity and received the denial email at her own personal email address. The Government also expects to prove that a Discover account was opened in another victim's name using the same application reference number depicted in a screenshot on Tameka's phone, and that the email address used for that application was an email address that Joel admitted belonged to him and which was linked to his Apple account, the subscriber name for which was "Rich Life."

13

The Court need not rely exclusively on Rule 801(d)(2)(E) to admit these fraudulent credit card applications. The applications are independently admissible as non-hearsay because they are offered for their falsity, not their truth. The Government does not offer the application entries to prove that the victims actually applied for credit cards, lived at the listed addresses, or authorized the applications. The Government offers them because the fraudulent representations were made to obtain credit in the victims' names.

In the alternative, if the Court treats the credit card applications as hearsay statements by Tameka or by another co-conspirator, they are still admissible under Rule 801(d)(2)(E). The applications were submitted during the charged conspiracies and directly advanced their objectives: obtaining money, credit, or access to financial accounts using stolen identity information. The applications were operative steps in the fraud. At a minimum, they "promote[d] or facilitate[d] achievement of the goals of that conspiracy." *Rivera*, 22 F.3d at 436. The Discover application is especially important as to Joel. The application was connected to Tameka's phone and IP activity and listed an email address linked to Joel's Apple account, which Joel admitted was his email address. That evidence helps prove not only the charged conspiracies' operation, but the coordination with which Joel and Tameka carried out their scheme.

### 3. Evidence of the Babulals' Mail Theft and Identity Theft Occurring Before and After the Charged Timeframe Is Admissible

The Government should be permitted to introduce evidence of the Babulals' mail theft and identity theft conduct before or after the timeframes specified in the various counts of the Indictment. The Indictment charges Joel Babulal with conspiracy to steal and unlawfully possess mail "[f]rom at least in or about July 2021 through May 23, 2024" in Count One; theft of mail by a postal employee and conspiracy to commit wire fraud and bank fraud "[f]rom at least in or about July 2023" through specified later dates in Counts Two and Four; unlawful possession of mail

14

"[f]rom at least in or about July 2023 through May 23, 2024" in Count Three; wire fraud and bank fraud "[f]rom at least in or about December 27, 2022, through at least in or about October 2023" in Counts Five and Six; aggravated identity theft "[f]rom at least in or about July 6, 2023, through at least in or about September 13, 2023" in Count Seven; and false statements "[o]n or about November 1, 2024" in Count Nine.

The Indictment repeatedly uses flexible charging language—"in or about," "from at least," and "through at least." That language matters. The Government need not prove the exact date of an offense unless the precise date is an element. *See United States v. Bimbow*, No. 21 Cr. 48 (JPO), 2022 WL 1617490, at *2 (S.D.N.Y. May 23, 2022) ("the government is not required to prove the exact date, if a date reasonably near is established"); *United States v. Nersesian*, 824 F.2d 1294, 1323 (2d Cir. 1987). Nor must the proof at trial be "a precise replica of the charges contained in an indictment," so long as the defendant has notice of the "core of criminality" to be proved. *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007). The relevant question is not whether every piece of evidence falls perfectly inside every charged date range; it is whether the evidence proves the core criminal conduct charged in the Indictment.

Here, evidence of mail theft, identity theft, fraud, stolen mail, stolen cards, fraudulent applications, and possession of other people's financial documents is not collateral merely because it occurred shortly before or after a specific count's date range—particularly where that conduct occurred while Tameka was employed as a mail carrier. It is part of the same pattern, using the same methods, accounts, residence, devices, and victim information. For example, although the Indictment charges unlawful possession of mail "[f]rom at least in or about July 2023 through May 23, 2024," evidence that Tameka and Joel possessed stolen mail before July 2023 is still relevant. Such evidence "adds context and dimension to the government's proof of the charges," *United*

15

*States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997), and is properly admitted where it "arose out of the same transaction or series of transactions as the charged offense," is "inextricably intertwined with the evidence regarding the charged offense," or is "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

That principle has particular force in a conspiracy case. Where an indictment charges conspiracy, an act done in furtherance of the conspiracy is "part of the very act charged," *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999), and "uncharged acts may be admissible as direct evidence of the conspiracy itself," *Thai*, 29 F.3d at 812. The jury is entitled to understand the full course of the conspiracy: how the Babulals obtained stolen mail and victim information, how they used financial accounts and mobile-payment services, how the stolen materials ended up in their shared bedroom, and how Joel's accounts, devices, and alias were connected to the fraud.

Even if the Court assesses this evidence under Rule 404(b), it should still be admitted. The evidence goes to knowledge because repeated possession and use of stolen mail, stolen cards, victim PII, fraudulent applications, and fraud-linked accounts makes it less likely that Joel innocently misunderstood what was happening in the shared bedroom or through his accounts. It goes to intent because the same pattern of conduct—using stolen cards, victim identities, and financial accounts to obtain money—makes it more likely that Joel acted with fraudulent intent when he participated in charged transactions. It goes to absence of mistake because the recurring use of stolen identities, stolen cards, and other people's mail rebuts any suggestion that the stolen mail materials in the shared bedroom, the Cash App transfers, or the alias/device links were accidental or coincidental. It goes to plan and preparation because the evidence shows the scheme's tools and methods: Tameka's USPS access, stolen mail, background-search information, victim PII, credit-card applications, mobile-payment accounts, prepaid phones, aliases, and the Marital

16

Residence as the mail theft and identity fraud scheme's control center. And it goes to relationship and mutual trust because the evidence explains why Joel and Tameka could jointly possess stolen materials and use connected accounts, devices, and aliases in furtherance of the scheme.

### 4.    The Court Should Admit Limited Evidence of Tameka Babulal's Extramarital Affair to Provide Context for Joel Babulal's Actions

The Government should be permitted to introduce limited evidence that, in 2023, Tameka Babulal was having an extramarital affair. This evidence is admissible to explain Joel's conduct, rebuts an anticipated defense theory, and helps prove several disputed issues.

Courts admit limited evidence of extramarital affairs where the affair is not offered for propensity or moral condemnation, but because it explains the parties' conduct and provides probative context for the charged offenses. *See United States v. Hoey*, 725 F. App'x 58, 60–61 (2d Cir. 2018) (spending evidence including "payments to his girlfriend" admissible because the evidence was probative of motive); *United States v. Moses*, 565 F. Supp. 3d 394, 400–03 (W.D.N.Y. 2021) (admitting evidence of an extramarital relationship where the Government did not intend to focus on infidelity, but offered the evidence to prove motive, travel, financial pressure, use of funds, and why the defendant acted as he did); *United States v. Shayota*, No. 15 Cr. 264 (LHK), 2016 WL 6534248, at *3 (N.D. Cal. Oct. 28, 2016) ("the evidence of [the defendant's] extramarital affairs is relevant to the Government's case against [the defendant], and its probative value is not substantially outweighed by its prejudicial effect under Rule 403. Evidence of [the defendant's] extramarital affairs is relevant to [his] financial motivation for engaging in the alleged crimes, and it is also relevant to tracing the proceeds of the alleged crimes."); *see also United States v. Menendez*, No. 15 Cr. 155, 2015 WL 5703199, at *11 (D.N.J. Sep. 28, 2015) (finding that the nature of extramarital relationship was relevant in bribery case because the value of a trip with a mistress would be greater than if the trip was not with a mistress). These cases recognize that

relationship evidence may be admissible where it explains "*what* Defendant did and *why* he did it." *United States v. Bonner*, No. 12 Cr. 3429 (WQH), 2014 WL 347439, at *2 (S.D. Cal. Jan. 30, 2014) (admitting evidence of extramarital affair) (emphasis in original).

While the Government will not improperly emphasize the extramarital affair, it is relevant to the Government's case for several reasons.

The evidence is probative because it tends to show Joel's knowing participation in the fraud. The Government expects to prove that, in April 2023, Joel contacted Tameka's paramour from a phone number Joel has acknowledged was his. Around the same time, records from a subscription service used to retrieve third-party PII—BeenVerified.com—show that an account in the name "Tameka Babulal," but using Joel's phone number and his admitted email address, conducted a reverse phone lookup query for the paramour's phone number and name. That evidence matters because the email address on the BeenVerified.com account was also used in the Babulals' fraud scheme, including on fraudulent credit card applications opened in the names of third-party victims residing along Tameka's mail routes. It also matters because Joel paid for the background checks using a payment card in Tameka's name, which shows that Joel had access to Tameka's financial instruments, used an email address connected to the fraud, and interacted with accounts in Tameka's name. That tends to make less probable a defense claim that Tameka's financial and digital activity was hidden from him.

Evidence of the affair is also inextricably intertwined with evidence showing that the cell phone number ending in 8717 was used by Joel. This phone was the number listed for "Mark Khan" in Tameka's USPS employment application, was a number used on fraudulent credit card applications, and was the number Joel specifically denied using in statements to the Government. The Government expects to prove through call detail records that Joel called and texted the

18

paramour several times in 2023, including on October 8, 2023, from another phone he admitted belonged to him. After that individual did not answer, the 8717 number called the same individual just 14 seconds later. Records will also show that, throughout 2023, Tameka used her own phone to call the individual (not the 8717 number), including on October 8, 2023. This evidence tends to prove that the 8717 number was used by Joel, contrary to his denials. The near-immediate sequence—Joel's own self-attributed number calling the paramour, followed seconds later by the 8717 number calling the same person—makes it more probable that Joel was using both numbers.

The evidence also fits comfortably within the Second Circuit's direct-evidence framework. Evidence is not limited to proof that directly establishes an element; it is relevant where it "adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). The affair evidence is necessary to explain why Joel was using fraud-linked email addresses and phones to search for and contact the paramour and why the record supports the conclusion that Joel was a user of the 8717 phone.

To the extent the Court analyzes any portion of this evidence under Rule 404(b), it is admissible for specific non-propensity purposes. As discussed above, the evidence helps prove the identity of the user of the 8717 number, as the affair evidence tends to make more probable that Joel used the 8717 number. As to knowledge, the evidence shows that Joel had access to and used a payment card in Tameka's name, along with an email address connected to the fraud scheme—making it more probable that he had access to Tameka's other financial accounts. As to relationship evidence, the affair is relevant because Joel is expected to make the state of the marriage part of his defense. The Government is entitled to meet that defense with a limited and accurate account. The evidence the Government seeks to introduce shows a more nuanced reality: even amid marital

19

conflict, Joel had access to Tameka's financial instruments, used fraud-linked tools, monitored the affair, and lived in a shared bedroom containing the instrumentalities of the fraud.

Rule 403 does not require exclusion. The Government will not elicit unnecessary intimate details, will not dwell on the morality of the affair, and will not argue that Tameka's infidelity makes either defendant more likely to commit fraud. Any residual risk can be addressed by an appropriate limiting instruction. *See United States v. Shyne*, 388 F. App'x 65, 71 (2d Cir. 2010) (affirming the admission of marital-infidelity evidence where the district court mitigated prejudice by instructing the jury not to decide the case based on whether the defendant had an affair).

### 5.    Evidence of Joel Babulal's Prior COVID-19 Unemployment Benefits Application and Subsequent Payments Is Admissible

The Government should be permitted to introduce limited evidence concerning Joel Babulal's September 2020 application for COVID-19 unemployment benefits, his subsequent certifications to receive payments, and the benefits payments he received. Those records show, among other things, that Joel listed the 8717 number as his phone number and claimed prior self-employment as a barber working from 304 Harvard Street. Although the application predates the conspiracies charged in the Indictment, the evidence is admissible for several reasons.

The evidence is probative of identity.  Joel listed the 8717 number as his phone number in the unemployment benefits application. Count Nine charges Joel with falsely denying that he used the phone number ending in 8717, and Joel's own unemployment benefits application listing the 8717 number as his phone number is direct proof that he used that number.

To the extent the Court views the unemployment benefits under Rule 404(b), it is admissible under that framework as well. As to identity, the evidence tends to make more probable that the user of the 8717 number in the fraud scheme was Joel. As to knowledge, the evidence shows that Joel considered the 8717 number to be his number. That makes his later denials reflect

20

consciousness of guilt. As to absence of mistake, the evidence makes less probable that the 8717

number was accidentally or incorrectly connected to Joel. The same number appears in his

unemployment application, his bank-account records, and Tameka's USPS application reference.

Finally, Rule 403 does not warrant exclusion. The evidence is limited and hardly

prejudicial. Obtaining unemployment benefits is not inherently prejudicial, especially when those

benefits were obtained during COVID. And a prior unemployment benefits application is certainly

not "more sensational or disturbing than the crimes with which [Joel is] charged." *Roldan-Zapata*,

916 F.2d at 804.

### 6.    The Court Should Admit Evidence of Joel Babulal Taking Pictures and Videos of Substantial Sums of Cash in 2020

The Government should be permitted to introduce three short videos created by Joel and

which show him with substantial amounts of cash. The videos were recovered from Tameka

Babulal's iCloud account, and their metadata shows that they were created on November 2, 2020.

These videos are admissible for several reasons.[1]

First, as discussed above, at the time the videos were created, Joel was receiving COVID-

19 unemployment benefits and certifying that he was not working. Yet he was recording substantial

sums of cash and, at least in one video, appearing with that cash. Direct evidence is "not confined

to that which directly establishes an element of the crime"; evidence is relevant if it "adds context

and dimension to the government's proof of the charges." *Gonzalez*, 110 F.3d at 941. The videos

add context and dimension to Tameka and Joel's relationship, showing their openness with each

other about their respective finances. Joel's anticipated defense is expected to portray him as an

innocent spouse who did not know that Tameka was committing fraud or using the Marital

---

[1] The Government will produce these videos under separate cover to the Court and defense counsel.

Residence and shared bedroom to store stolen mail, checks, credit cards, and identifying information. But the fact that videos of Joel and substantial cash were stored in Tameka's iCloud account tends to show financial openness between them, not concealment. Their financial openness is particularly telling given the context in which that video was created, namely, at a time when Joel was receiving unemployment benefits. "[I]t is well settled that evidence of large amounts of unexplained wealth is relevant to create an inference of illicit gain." *United States v. Tavarez*, No. 13 Cr. 947 (JGK), 2015 WL 1137550, at *8 (S.D.N.Y. Mar. 12, 2015) (internal quotations omitted); *see also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) (evidence of possession of large amount of cash was admissible because the defendant reported only modest amounts on his tax returns and a reasonable jury could conclude that "unexplained cash" indicated a source of illicit income).

Second, the videos are also directly relevant to Count Nine, which charges Joel with making false statements about his use of the "Mark Khan" alias and the 8717 number. Through Western Union transaction records, the Government expects to show that "Mark Khan" made approximately $1,300 in cash transfers to others, including Joel's family members, in the two-month period around the date the videos were created. In statements to federal law enforcement, Joel provided a fictitious explanation for Western Union transfers by "Mark Khan" to Joel's family members abroad. The videos therefore tend to make more probable that the 2020 Western Union transfers, which were made in cash and by "Mark Khan," were, in fact, made by Joel. In addition to proving the falsity of Joel's statements to federal law enforcement, this evidence makes it more probable that Joel was the person using the "Mark Khan" alias and less probable that his later denials were truthful or mistaken.

22

To the extent the Court analyzes the videos under Rule 404(b), they are admissible to show the nature of the relationship between Joel and Tameka. The fact that the videos were stored in Tameka's iCloud account, and therefore presumably sent by Joel to Tameka, tends to show that Joel was willing to display substantial cash to Tameka and that financial matters outside ordinary employment income were not hidden from her. That rebuts the anticipated defense that Tameka's fraud and fraud proceeds were hidden from Joel and supports the Government's theory of a financially intertwined relationship.

Rule 403 does not warrant exclusion. The videos are short, concrete, and probative. They are not more inflammatory than the charged conduct. Any prejudice can be addressed by a limiting instruction that the evidence is not being admitted to show that Joel committed a crime but rather to explain the nature of his relationship with his wife. *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) (recognizing the "strong presumption that juries follow limiting instructions"). Such evidence is particularly important given Joel's anticipated defense of his ignorance and Tameka's purported concealment of her crimes.

### 7. The Court Should Admit Evidence of Joel Babulal Taking Pictures and Videos of Substantial Sums of Cash in 2022

The Government should also be permitted to introduce three photographs from Joel's iCloud of substantial sums of cash taken in the Babulals' shared bedroom in the marital residence in 2022, during the charged conspiracy.  This evidence is admissible for several reasons.[2]

First, these photos directly connect Joel with substantial cash in the shared bedroom where law enforcement later recovered dozens of credit cards and mail items from financial institutions in other people's names, dozens of checks made out to people other than the defendants, Social

---

[2] The Government will produce these images under separate cover to the Court and defense counsel.

Security cards in other people's names, bundles of mail deliverable to Mount Vernon residents, and other identifying documents. Such evidence is direct evidence of the charged conspiracy. The Government's proof will show that the Babulals used their shared bedroom in the Marital Residence as an operating and storage location for their fraud scheme. Moreover, such evidence tends to prove that Joel knew about the contents of the shared bedroom, as a jury could reasonably conclude that someone who records substantial cash in a shared bedroom is more likely to be familiar with the room's contents and use.

The evidence is also probative because the conspirators themselves understood the significance of cash. The Government expects to introduce communications in which a co-conspirator advised Tameka to "[u]se cash" so that fraudulent activity would not be "attached to [her] name." That statement shows that cash was not incidental to the scheme; it was a method of concealment. The 2022 images of cash in the shared bedroom therefore help the jury understand how cash was handled and stored in the same shared space where stolen mail and instruments of the Babulals' fraud scheme were later recovered.

Finally, as with the 2020 images, the evidence is probative of Joel's knowledge. Joel is expected to argue that Tameka secretly committed fraud and stored stolen mail, checks, credit cards, and identity documents in their shared bedroom without his knowledge. But the cash images were uploaded to Joel's iCloud from Joel's iPhone and depict substantial cash in that same bedroom. That makes it less plausible that Joel was unfamiliar with the room's contents or unaware that it was being used to store the instruments of the charged fraud scheme. The evidence is also probative of joint possession and access. A shared bedroom containing substantial cash in 2022 and, later, extensive mail-theft and identity-fraud materials in 2024, supports the inference that the room was a common storage location for valuable items and scheme-related materials.

24

If the Court treats the 2022 cash images as Rule 404(b) evidence, they are admissible for specific non-propensity purposes. They go to knowledge because Joel's own device captured substantial cash in the same bedroom later found to contain the instruments of fraud. They go to intent because the cash evidence, in context, supports the inference that the bedroom was being used to store and manage value connected to fraudulent activity. They go to plan and preparation because the evidence shows the scheme's operating environment: cash, stolen mail, checks, credit cards, and identity documents stored in the marital bedroom. And they go to relationship and mutual trust because the shared bedroom was a space in which both defendants had access to cash and, later, the tools of the fraud. The Second Circuit's inclusionary approach permits such evidence for "any purpose other than to show a defendant's criminal propensity," including to explain the background of the conspiracy and "the mutual trust that existed between coconspirators." *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017).

Rule 403 does not support exclusion. The proffered evidence consists of three images. It will not create a mini-trial. The Government does not need to prove the precise source of every dollar for the evidence to be relevant; it is enough that the evidence makes consequential facts more probable when viewed with the rest of the trial proof. Nor is the evidence more sensational or disturbing than the charged conduct. Any residual concern can be addressed through a limiting instruction. *See Snype*, 441 F.3d at 129.

**II.      The Court Should Preclude the Defendant from Introducing Evidence and Arguments that Are Irrelevant and Unfairly Prejudicial**

**A.      The Court Should Preclude Any Evidence or Argument about the Government's Charging Decisions or Evidence that Tameka and Joel Were Not Charged at the Same Time**

The Government seeks to preclude any evidence or argument relating to the Government's motives or charging decisions, including its initial decision not to charge Joel, the fact that law

enforcement arrived at the Marital Residence with an arrest warrant for Tameka but not Joel, and the fact that other co-conspirators still have not been charged. Such argument or evidence is irrelevant to the charged offenses and unduly prejudicial and confusing under Rule 403.

As a general matter, the Government's motives for the prosecution of a defendant are irrelevant to guilt or innocence and therefore cannot be presented to the jury. *See United States v. Stewart*, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"). The same is true of the Government's techniques in investigating and prosecuting crimes. *United States v. Saldarriaga*, 204 F.3d 50, 53 (2d Cir. 2000) ("The jury correctly was instructed that the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged."). Moreover, invitations for jury nullification based on the overall propriety of the Government's investigation are not allowed. *See, e.g.*, *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the Government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (noting that the defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"), *aff'd*, 173 F. App'x 899 (2d Cir. 2006).

Any evidence or argument that the Government initially charged Tameka but not Joel, or that it arrived at the marital residence with an arrest warrant for Tameka but not Joel, should be precluded. The Government first charged Tameka by complaint and then, upon conducting the

26

search of the Marital Residence and executing an arrest warrant for Tameka, decided to amend the Complaint to charge Joel. "There are many factors that influence the government's decision not to prosecute a defendant on certain charges . . . ." *United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir. 1990); *see also United States v. Sua*, 307 F.3d 1150, 1153 (9th Cir. 2002) (following holding in *Delgado*). As a general matter, "the motivations behind the prosecutor's charging decisions are unknown, undiscoverable, and thus favorable neither to the defendant's nor to the prosecutor's case." *United States v. Scott*, 631 F.3d 401, 405–07 (7th Cir. 2011). The Government's reasons for not charging Joel at the same time as Tameka are irrelevant to a defendant's factual guilt at trial and risk confusing and misleading the jury. See *United States v. Brown*, No. 07 Cr. 874, 2009 WL 497606, at *7 (E.D.N.Y. Feb. 26, 2009) (stating that presenting evidence of a prior decision not to prosecute a particular defendant "risks confusing and misleading the jury"); *United States v. Paloscio*, No. 99 Cr. 1199, 2003 WL 21910875, at *1 (S.D.N.Y. Aug. 11, 2003) (finding risk of confusing the jury if evidence of a *nolle prosequi* is presented at trial).

Moreover, any evidence that the Government has not charged any other co-conspirator should be precluded. As noted above, "many factors . . . influence the government's decision not to prosecute" an individual. *Delgado*, 903 F.2d at 1499. Whether or not others were prosecuted does not reduce Joel Babulal's own culpability and thus is irrelevant to his case:

> Now, it has been suggested that if these men were guilty, there were others just as guilty. That does not make any difference. . . .If there are other persons who might have been prosecuted, and would have been liable, and they are not prosecuted, that is no concern of yours. You are only to consider the question of whether these defendants conspired in the way alleged, and whether the overt act was committed.

*Hyde v. United States,* 225 U.S. 347, 376–77 (1912) (quoting jury instruction given by lower court); *see also United States v. Ganiyu*, No. 23 Cr. 0331 (LAK), 2024 WL 1484154, at *4 (S.D.N.Y. Apr. 5, 2024) ("As a general matter, the fact that other persons have not been charged is

irrelevant to the jury's consideration of a defendant's guilt or innocen[c]e."); *United States v. Ramsey*, No. 21 Cr. 495 (ARR), 2023 WL 2523193, at *6 (E.D.N.Y. Mar. 15, 2023) ("Although defendants may admit evidence to show that someone else committed the crime with which they are charged, evidence that [another person] has not been charged does not fit this description.").

> **B.** **The Court Should Preclude Any References to Joel Babulal's Potential Punishment, Including His Immigration Status or Immigration Consequences if He Is Convicted**

The Government seeks to preclude any evidence or argument relating to collateral consequences from a guilty verdict against Joel or his potential punishment, including any reference to Tameka's sentence if she is sentenced prior to Joel's trial. While the fact that Joel is from Trinidad is directly relevant to the evidence that the Government intends to elicit in this case, any reference to Joel's immigration status or any suggestion that he may face adverse immigration consequences if he is convicted should be precluded.

"[J]uries are not to consider the consequences of their verdicts." *Shannon v. United States*, 512 U.S. 573, 579 (1994). Thus, "it would be improper for the jury to hear about any potential . . . consequences of a guilty verdict" because such evidence "do[es] not bear on the charged crimes." *United States v. Adelekan*, 567 F. Supp. 3d 459, 471 (S.D.N.Y. 2021) (granting motion to preclude introduction of "evidence concerning the punishment or . . . consequences of conviction").

Moreover, it is well-established that juries are not "to act based on their . . . sympathy." *United States v. Stroming*, 838 F. App'x 624, 627 (2d Cir. 2021). Any attempt to encourage such sympathy is therefore an attempt at nullification, which is itself plainly improper. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (observing that jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent"). "District courts have broad discretion to balance the probative value of evidence against

possible undue sympathy or bias as well as prejudice." *United States v. Miller*, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009). Courts have broad discretion to exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one[.]" Fed. R. Evid. 403, Adv. Comm. Notes. Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses." *Miller*, 641 F. Supp. 2d at 167; *see also United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); *United States v. Kaufman*, 2021 WL 51521, at *1 (S.D.N.Y. Jan. 6, 2021) (precluding evidence and argument "concerning defendant's family background, health conditions, other personal factors unconnected to guilt or innocence" as it would "invite the jury to determine the case on the basis of factors that are not relevant to guilt or innocence"); *United States v. Battaglia*, 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

The Court should preclude any evidence or argument that might reveal the consequences of the jury's verdict. By the time of Joel's trial, Tameka is scheduled to have been sentenced. Given that Tameka pleaded guilty to conduct overlapping substantially with the charges against Joel, any evidence concerning her sentence should be precluded because it would inadvertently disclose, or, at a minimum, suggest Joel's potential sentence. Where the jury has no role at sentencing—such as in this case—it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (internal quotations

omitted). This is so for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Id.*

The Court should also preclude any evidence or argument that might invite the jury to consider Joel's potential immigration consequences if he were convicted or acquitted, including any reference to his immigration status, which is not relevant to his guilt or innocence. *Id.* Accordingly, the defense should not be permitted to suggest—in opening, closing, or during questioning of witnesses—that deportation may be a consequence if Joel is convicted at trial.

### C. The Court Should Preclude Any Reference to Counsel's Presence at the November 1, 2024 Innocence Proffer

Count Nine charges Joel with making false statements to the Government at a November 1, 2024 innocence proffer. At that proffer, AUSA Watson and Special Agent Anthony Giattino of the United States Postal Service, Office of the Inspector General, were present for the Government, and defense counsel Mr. Howard Tanner was present for Joel. The Government intends to call Agent Giattino to testify about Joel's statements during that proffer.  The Court should preclude any reference to AUSA Watson's or Mr. Tanner's presence at the proffer to avoid their inadvertently becoming uncalled and unsworn witnesses.

The Second Circuit has repeatedly recognized the danger that a lawyer with first-hand knowledge of disputed facts may "subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross-examination." *United States v. Locascio*, 6  F.3d 924, 933 (2d Cir. 1993). That concern is especially acute where the lawyer is a prosecutor. A prosecutor is "cloaked with the authority of the United States Government," and any suggestion that the prosecutor personally knows the disputed facts risks encouraging the jury to trust the Government's implicit judgment rather than its own assessment of the evidence. *United States v.*

*Certified Environmental Services, Inc.*, 753 F.3d 72, 95–96 (2d Cir. 2014). To avoid turning either AUSA Watson or Mr. Tanner into unsworn witnesses at Joel Babulal's trial, the parties should be precluded from referencing or otherwise disclosing who—other than Agent Giattino or Joel—was present at the innocence proffer.

### III.    The Court Should Admit into Evidence Certified Records that Are Admissible and Self-Authenticating

The parties have been meeting and conferring concerning the authenticity of certain certified records. Although the Government anticipates that the parties will be able to resolve these issues by stipulation, absent such stipulation, the Government intends to authenticate certified records pursuant to Federal Rules of Evidence 902(11), 902(13) or 902(14). The Court should also permit the admission of these records, as specified below, as either non-hearsay or exceptions to the rule against hearsay under Federal Rule of Evidence 803.

#### A.    Applicable Law

##### 1.    Rules 902(11) and 803(6)

Under Rule 803(6), a record may be admissible under the business-records exception to the rule against hearsay if it was made at or near the time by someone with knowledge, or who had the information transmitted to them by someone with knowledge; the record was kept in the course of a regularly conducted activity of a business or organization; and making the record was a regular practice of that business activity. Fed. R. Evid. 803(6). "The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632–33 (2d Cir. 1994) (internal quotation marks omitted). The Second Circuit has taken a "generous view of the business records exception, construing it to favor

31

[] the admission of evidence . . . if it has any probative value at all." *United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995).

Business records of regularly conducted activity that meet the necessary conditions to qualify under Rule 803(6)'s hearsay exception may be authenticated, among other methods, by a certification that complies with Rule 902(11). Fed. R. Evid. 803(6)(D); *see also United States v. Weigand*, 20 Cr. 188 (JSR), 2021 WL 568173, at *1 (S.D.N.Y. Feb. 14, 2021) (admitting recordings pursuant to Rule 902(11) and noting that neither business records nor custodian certifications were testimonial so as to trigger the Confrontation Clause); *United States v. Ayelotan*, 917 F.3d 394, 402 (5th Cir. 2019) ("Records are self-authenticating if they include a custodian certification that the records meet the requirements of Rule 803(6)(A)-(C).") (cleaned up). "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013). Specifically, Rule 902(11) provides, in relevant part, that "[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Prior to trial, the proponent of the records must give the adverse party reasonable written notice of the intent to offer the records and make the records and certifications available for inspection so that the adverse party has a fair opportunity to challenge them. Fed. R. Evid. 902.

### 2.    Rule 902(13)

Pursuant to Federal Rule of Evidence 902(13), records generated by an electronic process or system that produces an accurate result may similarly be authenticated pursuant to a certification. To be admitted pursuant to Rule 902(13), the party seeking to admit the records must also meet the notice requirement of Rule 902(11). *Id.* Rule 902(13) was adopted because "the expense and inconvenience of producing a witness to authenticate an item of electronic evidence

is often unnecessary" because there is no "real challenge to authenticity." *Id.*, Notes of Advisory Committee on 2017 Amendment. A Rule 902(13) certificate should "contain information that would be sufficient to establish authenticity were that information provided by a witness at trial." *Id.*

### 3.    Rule 902(14)

Pursuant to Federal Rule of Evidence 902(14), data copied from an electronic device, storage medium, or file may also be authenticated pursuant to a certification "if authenticated by a process of digital identification, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." *Id.* The notice requirements of Rule 902(11) also apply.

### B.    Discussion

The Government will offer records obtained from certain entities, as described below,[3] which have been certified as business records, records generated by an electronic process or system, or data copied from an electronic device, storage medium, or file. *See* Fed. R. Evid. 902(11), (13), and (14).

- USPS records, including Tameka Babulal's employment file and mail route and delivery data;

- New York State Department of Labor documents relating to applications and payments of unemployment benefits;

---

[3] In all likelihood, the Government will only introduce a subset of these records. The Government has also produced to the defense extraction reports from electronic devices seized from pursuant to search warrants. The Government may seek to introduce those reports pursuant to Rule 902(14), and, absent stipulation, would produce an appropriate certification. *See United States v. Terranova*, No. 23 Cr. 516 (KAM), 2024 WL 4295508, at *13 (E.D.N.Y. Sept. 26, 2024) ("[D]ata that the [G]overnment extract[s] from [a] cellular telephone may be authenticated under Rule 902(14).").

- Stored Communications Act provider records, such as the accountholder's subscriber information, social media information, emails, chat messages, and documents in cloud storage, from providers including Apple, Google, and Meta (Facebook and Instagram);

- Telecommunications records, such as subscriber information, IP logs, and telephone toll records from AT&T, T-Mobile, and Verizon;

- Financial records from banks and other traditional financial institutions, including transaction records and accountholder information, from American Express, Bank of America, Charles Schwab, Credit One Bank, Discover, Jovia Credit Union, J.P. Morgan Chase, KeyBank, Stride Bank, New Millennium Bank, and Vermillion State Bank;

- Financial records from other payment services providers such as Block Inc. (Cash App), Early Warning (Zelle), Green Dot, MoneyGram, PayPal, Pathward, and Western Union; and

- Various additional records from relevant businesses, including from BeenVerified.com, Pada Food Corp., Progressive, Taco Bell, and Walgreens.

The Government obtained the above listed records in multiple rounds of legal process from these entities, and the Government seeks to authenticate these documents through the written certifications that accompany the produced records, each of which satisfies the relevant rules. Because the records produced by these providers are certified records that satisfy the requirements of Rule 803(6), they are self-authenticating under Rule 902(11), (13) and/or (14) without extrinsic evidence of authenticity or the need to call a custodian of records from each of these entities to establish that they are business records. In addition to being self-authenticating, the records are also admissible under the relevant hearsay rules. For instance, because they are business records that meet the requirements of Rule 803(6), records of financial transactions from Cash App and Zelle are admissible as exceptions to the rule against hearsay.

Accordingly, the Court should allow the introduction of the above-referenced records without requiring the live testimony of any document custodian.[4] A finding by the Court that

---

[4] The Government has already produced many of the certifications it intends to rely upon to admit these records. The Government will produce any additional certifications to the defendant on a

34

certain documents are business records that may be introduced pursuant to written certification under Rule 902(11) will obviate the need for significant inconvenience and expenditure of time by custodian witnesses from these institutions. Moreover, a finding by the Court that business records may be introduced pursuant to written certification would meaningfully streamline the Government's presentation of evidence, serve the ends of judicial economy, and preserve the time and attention of the jury.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Government's motions *in limine* in their entirety.

Dated:  White Plains, New York
        May 9, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney
Southern District of New York

By:  _____
     Reyhan Watson
     John Sarlitto
     James McMahon
     Assistant United States Attorneys

---

rolling basis. Accordingly, the defendant now has "notice of the intent to offer" the relevant records, and an opportunity to inspect them and the certifications (save for those that may be forthcoming), "so that the [adverse] party has a fair opportunity to challenge them." Fed. R. Evid. 902(11). The Government reserves the right to identify other documents that it may seek to introduce pursuant to written certifications under Rule 902, and will timely notify defense counsel if it intends to do so. These records should similarly be admissible pursuant to Rule 902(11), (13), or (14), unless the defendant raises a valid and specific objection.