TANNER & ORTEGA, L.L.P.
ATTORNEYS AT LAW
WWW.TANNERORTEGA.COM

HOWARD E. TANNER*
HUGO G. ORTEGA
*MEMBER OF N.Y., N.J. AND D.C. BAR

**NEW YORK CITY OFFICE**
277 BROADWAY
SUITE 1701A
NEW YORK, NY 10007
OFFICE: (212) 962-1333
FAX: (212) 962-1778

**WHITE PLAINS OFFICE**
170 HAMILTON AVENUE
SUITE 300
WHITE PLAINS, NY 10601
OFFICE: (914) 358-5998
FAX: (212) 962-1778

November 9, 2026

Honorable Cathy Seibel
United States District Judge
United States District Courthouse
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

BY ECF AND EMAIL/PDF

Re: ***United States v. Joel Babulal*, 25 Cr. 310 (CS)**
**Defense Sentencing Letter**

Dear Judge Seibel:

I submit this sentencing letter on behalf of Joel Babulal, who is scheduled to be sentenced by this Court on Monday, November 23, 2026 at 10:00 am for his plea of guilty to Count One of the instant Indictment (ECF Doc No. 56), conspiracy to steal and unlawfully possess mail, in violation of 18 U.S.C. §371.

Joel, a 38-year-old man who had substantially lived a law-abiding life, became involved, as a minor participant, in a scheme devised and ostensibly executed by his co-defendant wife Tameka Babulal, a former United States Postal Service ("USPS") letter carrier, in a foolhardy attempt to enrich herself. For the mitigating reasons set forth in this letter, I respectfully request that the Court impose a below-Guidelines range non-custodial sentence and Supervised Release for two years, with restitution to the victims. Such sentence would be sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §3553(a).

## Case Background, The Plea Agreement and Objections to Probation PSR

The defendant is in receipt of the Probation Office's Final Presentence Report dated August 19, 2026 (ECF Doc No. 87) ("PSR"), which details the offense conduct (PSR ¶¶6-24). As described, it is clear that co-defendant Tameka Babulal, "abused a position of public trust", in having "significantly facilitated the commission or concealment of the offenses…" Id. ¶25. As a "minor participant…Joel Babulal had a lesser role and is less culpable…" Id. ¶26.

After submitting an application for the position, Co-defendant Tameka Babulal obtained employment as a USPS letter carrier. Specifically, on July 12, 2021, she listed on her application prior employment at a Taco Bell with her manager "Mark Khan" and his phone number, ending in 8717, as a reference. In reality, Mark Khan was a fictitious name created by her and used as an alias by her and Joel. The phone number she provided was also used by Joel. Id. ¶24. From December, 2022 to May, 2024, Tameka Babulal used her position as a letter carrier in Mount Vernon, New York to steal hundreds of pieces of mail from victims, opened them and removed credit cards, checks and money orders while on her postal route, and brought and stored the mail at her home that she shared with Joel. Id. ¶¶8, 9. During this period, she made numerous ultimately unsuccessful attempts to deposit stolen checks (some of them by altering the checks), use the stolen credit cards at stores and online, to make purchases, and attempted to activate or open stolen credit cards and bank accounts in victims' names from information she obtained from the stolen mail. Banking security measures substantially blocked all of these attempts, with a total of $609 charged to stolen credit cards. Id. ¶28. The stolen mail was found by law enforcement during the execution of a search warrant at the residence on May 23, 2024, at which time Joel and Tameka were both arrested. Id.

He was initially presented before the Honorable Judith C. McCarthy the same day for on a Complaint alleging theft of mail, conspiracy to commit wire and bank fraud, bank fraud and aggravated identity theft (ECF Doc. 2). He was released on an unsecured $30,000 bond cosigned by one financially responsible person on standard conditions (ECF Doc. 8), and has been at liberty under substantially the same conditions since that time, except for a drug testing condition added after his guilty plea due to his testing positive for marijuana on July 1, 2026. PSR ¶4. Other than this one failed urinalysis, the defendant has been compliant with all conditions while on pretrial release for over two years (PSR, Addendum, at 31).

The parties were able to reach a pretrial resolution by Plea Agreement, dated May 27, 2026. On May 29, 2026, the defendant appeared before Your Honor and pleaded guilty to Count One of the Indictment (ECF Doc No. 56), conspiracy to steal and unlawfully possess mail, in violation of 18 U.S.C. §371. Also, as part of the Agreement, the defendant admitted to the falsely stating to officials during a meeting at the United States Attorney's Office on November 1, 2024, that (i) he did not use the name "Mark Khan," (ii) he did not use a phone number ending in 8717; (iii) he did not know why an Instagram account with the Instagram ID "mark.khan.3192479" was on his phone; and (iv) he did not purchase any Amazon packages to be shipped to "Mark Khan" at his residence in Hempstead, New York. The parties stipulated to the following offense level calculations and Criminal History Category under the Guidelines:

Pursuant to U.S.S.G. § 2X1.1(a), the Guideline applicable to the offense charged in Count One is U.S.S.G. § 2B1.1; the base offense level is six. U.S.S.G. § 2B1.1(a)(2); the total loss for purposes of U.S.S.G. § 2B1.1(b)(1) is more than $150,000 and less than $250,000, for an offense level increase of 10 levels.[1] U.S.S.G. § 2B1.1(b)(1)(F); the offense involved 10 or more victims increasing the offense level by two levels. U.S.S.G. § 2B1.1(b)(2)(A)(i); as a minor participant in the criminal activity, the offense level is decreased by two levels. U.S.S.G. § 3B1.2(b); A three-level reduction for acceptance of responsibility pursuant to U.S.S.G.

---

[1]Amendment to the loss table in U.S.S.G. § 2B1.1(b)(1) effective November 1, 2026, reduces the defendant's increase in offense level from 10 to 8. As explained herein, the defendant is entitled to the benefit of the amendment.

§§ 3E1.1(a)-(b); and a zero-point offender decrease of two levels for a pursuant to U.S.S.G. § 4C1.1(a). This calculates to a Total Offense Level of 11, in Criminal History Category I, resulting in a stipulated Guidelines range of 8 to 14 months' imprisonment.

The Probation Office disagrees with this sentencing calculation as set forth in the Plea Agreement, asserting that Joel's 2017 New York State Violation and 5-day jail sentence for Driving While Ability Impaired (PSR ¶¶49, 87) precludes the zero-point offender two-level reduction and further, assessed a two-level Specific Offense Characteristic enhancement pursuant to USSG §2B1.1(b)(11)(B), (PSR ¶88), for production or trafficking of an unauthorized/counterfeit access device or an authentication feature. They calculate a Total Offense Level of 15 at Criminal History Category I for a Guidelines range of 18 to 24 months' imprisonment. Due to the defendant's minor role in the offense, his long-term compliance with pretrial release, lack of substantial criminal history and mild risk of recidivism, they recommend a sentence below their calculated range, for a sentence of imprisonment for one year and a day to be followed by two years' Supervised Release (PSR, Addendum, at 30-31). For the reasons detailed herein, I object to Probation's calculation and respectfully submit that their recommended sentence of one year and a day imprisonment, at the high end of the parties' stipulated Guidelines range, would be greater than necessary and constitute an unwarranted sentencing disparity pursuant to 18 U.S.C. § 3553(a)(6), given Tameka Babulal's sentence imposed, as well as prior sentences imposed by this Court for similarly situated defendants.

As to the Final PSR, Probation repeatedly attributes overt acts to Joel Babulal for specific criminal conduct alleged in Counts Two through Seven of the Indictment, to which he did not pleaded guilty, and which are anticipated to be dismissed on application by the Government at sentencing. The defendant pled guilty and allocuted to Count One only, a conspiracy to possess stolen mail; not to bank or wire fraud or to aggravated identity theft. As reflected in his guilty plea allocution, Tameka Babulal stole mail and Joel agreed to possess that mail which was stored in their shared marital residence. Although it was reasonably foreseeable that monetary loss could result to the victims of the stolen mail by it being withheld from the intended recipients, the parties agreed that he was a peripheral, minor participant, as confirmed by his minor role adjustment in the Plea Agreement and in Probation's own Guidelines calculation. Tameka Babulal's criminal acts of wire fraud, bank fraud, and identity theft, to which she pled guilty and was sentenced, far exceed the scope of the overt acts detailed in Count One of the Indictment and are not specifically attributable to Joel. I therefore object to certain statements in the following paragraphs of the PSR and request either deletion or amendment as follows:

Paragraph 11 – I request that "including Joel Babulal" be deleted from the following paragraph: "The fraud scheme by TAMEKA BABULAL and her co-conspirators, including JOEL BABULAL, was facilitated by TAMEKA BABULAL's theft of mail, particularly through their use of stolen credit cards, stolen checks, and stolen identifying information from victims. From at least July 2023, through May 23, 2024, TAMEKA BABULAL and her co-conspirators, including JOEL BABULAL, used credit cards in the names of other people, obtained those cards and related identifying information from stolen mail, and fraudulently deposited stolen checks, including through the internet, mobile payment services such as Cash App, telephone calls, emails, and other electronic communications made from their phones or other electronic devices.

Paragraph 15 – I request that "including Joel Babulal" be deleted from the following paragraph: "In total, TAMEKA BABULAL and her co-conspirators, including JOEL BABULAL, made or attempted at least around $40,922.41 in fraudulent transactions using stolen credit cards. An additional 48 credit cards were found in the residence that TAMEKA BABULAL. shared with JOEL BABULAL. At least one stolen credit card added to JOEL BABULAL's Cash App account was not found at the residence."

Paragraph 16 – I request that "including Joel Babulal" be deleted from the following paragraph: "TAMEKA BABULAL and her co-conspirators, including JOEL BABULAL, also used various means of identification of their victims, real people living in Mount Vernon on TAMEKA BABULAL's mail routes, to carry out their fraud scheme."

Paragraph 17 –I request that "including Joel Babulal" be deleted from the following paragraph: "As set forth below, TAMEKA BABULAL and/or her co-conspirators, including JOEL BABULAL, submitted a Discover credit card application in Individual Victim-1's name."

Paragraph 19 –I request that "including Joel Babulal" be deleted from the following paragraph: "At the time of the mail theft and fraud scheme, Individual Victim-2 was a 49-year-old female residing in Mount Vernon. As set forth below, TAMEKA BABULAL and/or her co-conspirators, including JOEL BABULAL, attempted to open both a Cash App account and a Wells Fargo credit card account in Individual Victim-2's name."

Paragraph 27 – I request that "and Joel Babulal" be deleted from the following paragraph: "As reflected in Count 7, TAMEKA BABULAL and JOEL BABULAL engaged in identity theft and they obtained the personal identifying information of their victims and then used that information to open accounts and obtain payment cards in those victims' names.

Addendum, page 30 – As to "[t]he stolen mail was then used by *the Babulals* and others to facilitate the fraud scheme. *The defendant is responsible for an intended loss of $164,519.57*, or which $609 were successfully charged to stolen credit cards. Additionally, *the defendant* and his wife used victims' personal information to apply for a fraudulent Discover credit card, Wells Fargo credit card, and Cash App account." (Emphasis added). Due to the previously stated grounds, I ask that "the Babulals" be amended to "Tameka Babulal", and "the defendant and his wife" be amended to "the defendant's wife". Finally, as to the restitution to be imposed for the loss to the victims, I note that the defendant has already been found by Order of Restitution to be jointly and severally liable in the amount of $20,151.39 (ECF Doc No. 98 at 9).

## **Personal, Family, Education and Employment History**

Joel Babulal, a 38-year-old Legal Permanent Resident, was born on January 20, 1988, in Trinidad & Tobago. His parents, Leonard Babulal, age 72; and Hafeeza Mohammad Babulal, age 62, reside in Trinidad. His father is a retired oil refinery worker, and his mother owns a deli. He has a sister, Leondra Babulal, age 29, a teacher who currently lives in Japan. He grew up in a good home, and was raised well by both parents as well as by his paternal grandmother, Eldika Babulal, who provided for all of his basic needs. His home was located in a close-knit village with neighbors who all looked out for each other. Although in a relatively safe neighborhood, he did witness as a child, drug activity and violence, endemic in third world countries but always

avoided any trouble or associating with bad characters. He enjoyed playing sports, including cricket and soccer, fishing and helping his father in yardwork and chores. He attended school regularly, graduating from high school in Trinidad at 17 years old. He never considered himself smart academically and does not write well, but was always a creative person who enjoys taking things apart and putting them back together, which presumably led to his proficiency in fixing cars, carpentry and other trade skills. He remains close with his parents and sister and speaks to them regularly. He last traveled to Trinidad to visit his parents in 2022.

On February 4, 2007, Joel immigrated to the United States alone to make a better life for himself. He was granted legal permanent resident status and holds a Green Card since December 9, 2017. Joel and Tameka began dating in January 2010 and married on October 19, 2010. They have no children together but Tameka has one son, Roberto Ruero, 18 years old. The marital home in Hempstead, NY, was previously owned by Tameka's deceased grandfather. Joel has no financial stake in it. During the course of their marriage, Tameka ran the household finances. Joel would give whatever he earned from work directly to Tameka or she would have access to his bank account from where she would pay some of the bills. Joel is not electronically savvy and is not good at navigating or downloading apps. He does not engage much in social media outside of one-on-one communications to reconnect with old friends and acquaintances on Facebook or Instagram and rarely uses other apps.

Their marriage became irretrievably broken months prior to the inception of this case when Joel suspected that Tameka was having an affair with a co-worker at USPS. When he confronted her about it, she consistently denied it. Cellphone text message discovery, however, indeed confirmed the affair, which had been going on for some time. The Babulals' marriage is in name only and prior to Tameka's surrender to prison, they cohabitated for financial reasons only, sleeping separately and only speaking to each other when necessary. Joel feels understandably betrayed by Tameka's infidelity but is also angry at himself for her "using him" and "sticking his head in the sand", which contributed to his participation in the crime to which he has pled guilty. He will be seeking a divorce shortly. He understands that he will likely be deported as a result of this case, but if he is lucky enough to avoid that outcome, he would like to relocate to his house in Albany, Georgia, which he purchased on foreclosure in 2020. In addition to his employment as a car mechanic with Immaculate Detailz in West Hempstead, New York, Joel also does construction work off the books with his cousin and freelances as a barber.

## Probation's Enhancement Pursuant to USSG §2B1.1(b)(11)(B) Does Not Apply

Probation has applied a two-level enhancement to Joel's Guidelines range calculation because "[t]he defendant along with his wife and co-conspirator, who received the same SOC at the time of sentencing, utilized the names, demographics, and likeness' (sic) of their victims to apply for a discover card, as well as a Cash App account, and Wells Fargo credit card." PSR ¶88. First, I am unclear as to what Probation means by the defendant having "received the same SOC at the time of sentencing"; and second, the defendant's guilty plea to Count One, Conspiracy to Steal and Unlawfully Possess Mail, pursuant to 18 USC §371, certainly encompasses the foreseeable loss suffered by the victims, but does not extend to Tameka's criminal acts of wire fraud, bank fraud and Aggravated Identity Theft as detailed in Counts two through seven of the Indictment. Pursuant to USSG §1B1.3(a)(1)(B), a defendant in a conspiracy is only held

accountable for the conduct of co-conspirators if that conduct was within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, *and* reasonably foreseeable in connection with that criminal activity. The "jointly undertaken criminal activity" to which the defendant allocuted to was conspiracy to possess the mail stolen by his co-defendant wife, not her further identity theft, downstream attempted monetization, banking schemes, or trafficking of access devices. Joel was a minor participant and Tameka's separate plea to the bank fraud, wire fraud, and aggravated identity theft counts cements this distinction. Probation's enhancement pursuant to USSG §1B1.3(a)(1)(B), not contemplated by the parties in the Plea Agreement, is erroneous and does not apply.

**The Defendant is Entitled to a 'Zero-Point Offender" Reduction Pursuant to U.S.S.G. §4C1.1(a)**

While the Government and the Defendant have explicitly stipulated in the Plea Agreement that the defendant is entitled to a two-level "Zero-Point Offender" offense level reduction pursuant to United States Sentencing Guidelines (USSG) § 4C1.1, the Probation Office has erroneously concluded that a 2017 traffic infraction disqualifies him.

The Defendant satisfies all eligibility criteria for the two-level "Zero-Point Offender" offense level reduction pursuant to USSG § 4C1.1. Because the Defendant has no other criminal history, his eligibility turns entirely on whether his June 18, 2017 conviction in Nassau County Court for Driving While Ability Impaired ("DWAI") under N.Y. Vehicle and Traffic Law (VTL) § 1192(1) counts toward his criminal history score. The PSR reflexively applies USSG § 4A1.2, Application Note 5, to argue that all convictions relating to "driving while intoxicated or under the influence" must be counted (PSR ¶49). However, the Second Circuit has explicitly rejected a blanket, categorical inclusion of New York DWAI traffic infractions. In *United States v. Potes-Castillo*, 638 F.3d 106 (2d Cir. 2011), the Court held that a VTL § 1192(1) DWAI sentence should not be treated as a standard DUI. Instead, it "should be treated like any other misdemeanor or petty offense" under USSG § 4A1.2(c)(1).

**A New York DWAI Conviction Is Not Categorically Counted Under the Sentencing Guidelines**

While USSG § 4A1.2, Application Note 5 generally states that convictions for "driving while intoxicated or under the influence" are counted, the Second Circuit has explicitly rejected the flat, categorical inclusion of New York DWAI infractions. In *Potes-Castillo,* the Court held that a VTL § 1192(1) DWAI sentence should not be reflexively treated as a standard DUI. Instead, it "should be treated like any other misdemeanor or petty offense" under USSG § 4A1.2(c)(1). *Id.* at 114.

Pursuant to § 4A1.2(c)(1), a prior petty offense or infraction is excluded from a defendant's criminal history score if it is "similar" to an enumerated list of minor offenses—specifically, "careless or reckless driving"—provided that the prior sentence was less than 30 days of imprisonment or less than one year of probation. As established in *Potes-Castillo*, Id. the statutory threshold for a New York DWAI is lower than the standard for driving under the influence or driving while intoxicated; it requires only proof that alcohol impaired the driver "to

any extent." Consequently, a routine DWAI operates legally and substantively closer to a minor traffic infraction or careless driving, making it eligible for total exclusion under § 4A1.2(c)(1).

In *United States v. Blake*, No. 24-1111, 2026 WL 32479 (2d Cir. Jan. 6, 2026), the Court held that the defendant's DWAI conviction was properly counted toward his criminal history score, not because it categorically" counted, but because the defendant engaged in extreme or life-threatening behavior by driving southbound in a northbound lane of a highway while intoxicated. Indeed, the Court expressly stated that it "need not resolve" whether or not a subsequent amendment to the 2023 version of USSG § 4A1.2, Application Note 5, abrogated the aforementioned holding in *Potes-Castillo,* that DWAI is not categorically counted as a conviction for "driving while intoxicated or under the influence".[2] Instead, *Blake* applied a fact-bound carve-out for highly egregious conduct. Because the Second Circuit declined to disturb the holding in *Potes-Castillo*, unless the underlying conduct involves extreme danger, the legal framework of Potes-Castillo applies. Indeed, as recently as 2025, courts in this district have applied the sentencing parameters detailed in *Potes-Castillo* in calculating Guidelines relevant to this issue, excluding DWAI in the Guidelines calculation. See, *United States v. Perez*, No. 24-cr-368 (JHR) (Dkt. 58), 2025 U.S. Dist. LEXIS 140024, 2025 WL 2047829, at 5.

*Potes-Castillo* therefore requires that the court evaluate the actual conduct involved and the penalty imposed. The Nassau County Court records cited by Probation (PSR ¶49) demonstrates that the Defendant's 2017 arrest lacks any of the extreme or life-threatening culpability present in *Blake*. The Defendant was initially stopped at for having tinted windows and (presumably) speeding at 50 mph. He was not driving the wrong way down a highway (as was the case in *Blake*), nor is there any evidence that he was weaving erratically, or caused any property damage or personal injury. While officers noted standard physical indicators (odor of alcohol, slurred speech, glassy eyes) and "positive field sobriety test", it is notable that there was no mention of any breathalyzer or blood alcohol test result. The Defendant cooperated fully, admitted candidly to having a single drink two hours prior, and was placed under arrest "without incident." He was not charged with possession of marijuana or any other drugs, notwithstanding the presence of "a small plastic bag of a green leafy substance in the console cup" in the car. This case, for which Joel was sentenced to 5 days jail and a conditional discharge, simply does not rise to the level of public danger seen in *Blake*. The sentence imposed was substantially less than the 30-day maximum threshold pursuant to USSG § 4A1.2(c)(1), which confirms that the state court treated viewed the conduct as an infraction, aligning it directly with the "careless or reckless driving" offenses intended for exclusion under § 4A1.2(c)(1).

Due to the foregoing, I respectfully submit that Joel's 2017 Nassau County DWAI violation must be excluded from his criminal history calculation. With this infraction properly excluded, he has zero criminal history points and meets all other criteria set forth in USSG § 4C1.1

---

[2] As noted in Blake, District Court decisions in the Eastern District have applied *Potes-Castillo* in calculating Guidelines Ranges. See, *United States v. Parades*, 185 F, Supp. 3d 287, 289 (E.D.N.Y 2016); *United States v. Walia*, No.14-cr-213, 2016 U.S. Dist. LEXIS 106495, 2016 WL 4257347, at 6-7 (E.D.N.Y. August 11, 2016).

**The Defendant is Entitled to the Benefit of**
**the 2026 Amendment to the Guidelines**

The Sentencing Commission promulgated amendments to the Guidelines, including the loss table pursuant to U.S.S.G. § 2B1.1(b)(1), effective November 1, 2026. In the Government's sentencing submission for co-defendant Tameka Babulal, they calculated the total loss for purposes of U.S.S.G. § 2B1.1(b)(1) in the amount of $164,519.57 (ECF Doc No, 60 at 7). In the Plea Agreement dated May 27, 2026, the calculated loss being more than $150,000 and less than $250,000, resulted in an offense level increase of 10. The aforementioned amendment to the loss table, however, reduces this increase from 10 to 8, pursuant to USSG §2B1.1(b)(1)(E), in that the loss amount of $164,519.57 is more than $150,000 but does not exceed $200,000.

Pursuant to U.S.S.G. §1B1.11(a) "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." The defendant relies on the stipulated Guidelines range in the Plea Agreement. Therefore, should the Court's Guidelines range calculation be in accordance with the parties' stipulated Guidelines range, I respectfully submit that the defendant's Total Offense Level is thereby reduced from 11 to 9, in Criminal History Category I, for a Guidelines range of 4 to 10 months imprisonment.

**Sentencing Considerations**
**Request for a Below Guidelines Range Sentence**

In *Gall v. United States*, 552 U.S. 38, 49-50 (2007), the Supreme Court held that the guidelines provide a starting point for a reasonable sentence, however, a sentencing court "must make an individualized assessment based on the facts presented." The Court also stated that the sentencing court cannot "presume that the Guidelines range is reasonable." *Id.* As a result, the sentencing court can use the advisory guidelines to create an appropriate sentence after considering the factors enumerated in 18 U.S.C. § 3553(a). That appropriate sentence may be outside the guidelines range as long as the "justification is sufficiently compelling to support the degree of the variance." *Gall*, at 50. I submit that a below Guidelines range non-custodial sentence, to be followed by two years' Supervised Release is sufficient but not greater than necessary under the totality of circumstances.

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), I request that the Court consider the aforementioned Guideline range along with the following factors listed in 18 U.S.C. §3553(a):

18 U.S.C. § 3553(a) FACTORS

The nature and circumstances of the offense and the history and characteristics of the defendant.

a) The nature and circumstances of the offense

The defendant's conduct under Count One of the Indictment is serious. As described in the PSR, Tameka Babulal abused her position of trust as a USPS letter carrier and stole hundreds of pieces of mail on her delivery routes including credit cards, checks, personal identifying information, and other items that came through Mount Vernon, New York. A search warrant at

Tameka and Joel's house revealed bundles of undelivered mail addressed to other people as well as undelivered packages addressed to other people. There were credit cards and checks found in the bedroom shared by them as well as other undelivered mail found in other parts of the house. It was reasonably foreseeable to Joel, that possessing and withholding that mail stolen by Tameka in their residence, would cause financial loss to the victims. He unwittingly provided Tameka the opportunity to take advantage of the privacy of their home, for example, to wash checks, attempt online deposits of numerous stolen checks; attempt to open bank accounts and credit card accounts online and other financial criminal acts. Through a combination of acquiescence and conscious avoidance, Joel's actions therefore assisted Tameka's outrageous breach of public trust in her theft mail and unwitting support for her concomitant financial crimes. In mitigation, I ask the Court to consider that Joel had a minor role in conspiring with Tameka to possess the mail that she stole, and took no part in stealing the mail. Indeed, as the defense was preparing for trial, it became apparent that Tameka, had conspired with other employee(s) of the USPS, and others, in abetting her financial crimes and identity theft. Unlike Tameka, Joel never intended use the stolen mail for financial gain or for any other purpose and did not gain financially from his actions.

Furthermore, as reflected in the Plea Agreement, the defendant admitted to the false statements alleged in Count Nine of the Indictment, that during a meeting with the Government on November 1, 2024, that (i) he did not use the name "Mark Khan," (ii) he did not use a phone number ending in 8717; (iii) he did not know why an Instagram account with the Instagram ID "mark.khan.3192479" was on his phone; and (iv) he did not purchase any Amazon packages to be shipped to "Mark Khan" at his residence in Hempstead, New York. Lying to the Government is also serious conduct. Such acts frequently impede the Government's investigations and increases the time and effort necessary to bring perpetrators to justice. Fortunately for the defendant however, none of his aforementioned false statements impeded the Government's investigation into this case, which the parties agreed did not merit an obstruction enhancement in the Plea Agreement. "Probation's determination is that the defendant's false statements did not substantially affect the investigation, and as such an adjustment for obstruction of justice pursuant to USSG §3C1.1, was not applied." (PSR ¶33).

The false statements related to matters not directly relevant to the charged offenses. Indeed, the defense had drafted comprehensive pretrial motions in limine, ready to be filed, when the parties were able to reach a resolution. These motions would have sought preclusion of much of the "Mark Khan" (a fictitious name created solely by Tameka) evidence, including her USPS employment application; evidence relating to Joel's Amazon purchases in the name of Mark Khan which were paid from Joel's bank account with legitimate funds; and other such evidence. This should not be misinterpreted as excusing the defendant's false statements he made to the Government, but to place them into context of his overall minor role conduct in this case.

b) The history and characteristics of the defendant.

Joel, 38 years old, immigrated to the United States from Trinidad at 19 years old in 2007 to make a better life for himself, leaving behind his mother and father with whom he is still very close. He obtained a Green Card in 2017. Never proficient in academics, with somewhat limited writing skills, Joel has worked as a laborer in construction, an auto mechanic, barber and other trades since his arrival here. He has substantially led a law-abiding life but for his

prior violation for DWAI in 2017. I submit that this case represents an aberration in behavior for Joel.

He met his wife Tameka in 2010 and were quickly married after several months of dating. As previously stated, during the course of their marriage, Tameka ran the household finances. Joel would give whatever money he earned from work directly to Tameka or she would have access to his bank account from where she would pay the bills. Joel doe not write well and is not electronically savvy. It is clear that Tameka's breach of trust in this case also extended to her husband Joel. She cheated on him with a coworker at USPS and plotted her financial crimes with others by using Joel's trustworthy nature, in accessing his phone and attempting fraudulent financial transactions, when she was blocked from doing so on her own phone. She downloading apps such as Amazon on his phone and created accounts using a fictitious name, Mark Khan, that she alone created. The emotional impact Tameka's actions have had on Joel is significant, to say the least. He feels betrayed and used by her. He will be seeking a divorce shortly and hopes to move away to the fixer upper house he purchased on foreclosure in Georgia to restart his life after sentence, obtain employment and begin paying restitution to the victims. He justifiably fears that he will be deported as a result of this conviction.

In the attached letters of support (Ex. A) his neighbors describe him as a good man who always lends a helping hand. For example, Ms. Shirley Frankin, a neighbor who knows Joel for approximately 10 years, writes to the Court that when she has spinal surgery last year, Joel prepared food for her on a daily basis and, with her husband, helped her get up and down the stairs in her home. Mr. Maurice Johnson, who has known Joel for over 20 years, writes that Joel frequently helps his elderly neighbors by cutting their grass, trimming their hedges and shoveling snow from their driveways and sidewalks free of charge. He helps kids in the community by fixing their bikes, also at no charge. "That's just the type of person Joel is, you don't necessarily have to ask for help, he always will offer his help if he sees a need… These instances reflect the character of someone who cares deeply about their community and family." His employer, Jerry Museau, representative of Immaculate Detailz, a full-service automotive detailing and customization shop in West Hempstead, New York, writes that "during the time Joel has worked with us, he has demonstrated himself to be dependable, respectful, hardworking and professional…Beyond his work performance…he has shown himself to be good person who is willing to work, take responsibility, and maintain a productive role in the community." Mr. Museau makes it clear that they will continue to call on Joel as an auto mechanic as their needs require.

For what its worth, I have had the opportunity to work closely with Joel, especially as we were preparing for the scheduled trial, and have always found him to be respectful, courteous, punctual to all of our office meetings and helpful in assisting me in his defense. He was a pleasure to work with, which I cannot always say about my clients. Finally, he is clearly remorseful for his participation in this case and expect that he will address the Court at sentencing to express his feelings.

The need for the sentence imposed. 18 U.S.C. § 3553(a)(2).

(a) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

I respectfully submit that the defense request for a below-Guidelines non-custodial sentence and a two-year term of Supervised Release would be sufficient and just sentence given the defendant's minor role in the offense and his substantial lack of criminal history. As a Legal Permanent Resident, not only will he carry the shame of a federal felony conviction on his record for the rest of his life, he is now likely to be deported from the United States, made even more likely with a custodial sentence. There can be no doubt that the conviction alone will act as a constant reminder and specific deterrent from engaging in any future criminal activity. He has comported himself exceptionally well throughout the pendency of this case. "Babulal has also, with the exception of a recent positive urinalysis result for marijuana, [after his guilty plea, a particularly stressful event] been compliant with the conditions of supervision since his arrest more than two years ago." (PSR, Addendum at 31). As for general deterrence, the defense recommended sentence will certainly be a sufficient warning that engaging in similar conduct will result in the aforementioned consequences, a substantial, life-changing consequence.

The Probation Office's recommended sentence of imprisonment for a year and a day to be followed by two years' Supervised Release, is presumably based on the criminal conduct alleged in Counts two through Seven of the Indictment, fraud and identity theft, to which Joel did not plead guilty. I respectfully submit that imprisonment any custodial sentence, much less a year and a day, would only serve a purely punitive purpose and be unduly harsh. The defendant did not profit nor was he ever motivated by profit. Finally, I submit that whatever term of supervision is imposed, it will be an easy job for the probation officer who is assigned to his case.

Avoiding Unwarranted Sentencing Disparities

On July 1, 2026 Your Honor sentenced co-defendant Tameka Babulal to a below-Guidelines range 39 months' imprisonment (ECF Doc. Nos. 84, 98). Specifically, 15 months' imprisonment for Counts 1-6 and 8, to run concurrently with each other; and the mandatory minimum of 24 months' imprisonment to run consecutively to the other counts. This sentence was substantially below the Government request for a Guidelines range sentence of 57 to 65 months' imprisonment (ECF Doc No. 80, at 22). I respectfully submit that Probation's recommended sentence of imprisonment, indeed any custodial sentence, would constitute an unwarranted sentencing disparity, given the co-defendant's 15-month prison sentence for all of the non-mandatory minimum counts of the Indictment, especially given the defendant's guilty plea to only a single count and his minor role in the crime.

Furthermore, recent cases in this Court involving much more egregious conduct than that of the defendant is in this case resulted in non-custodial sentences. For example, in *United States v. Norma Getten, and Sherril Baez*, 23 Cr. 662 (CS), a case before Your Honor involved a conspiracy in the fraudulent submission of approximately 114 Paycheck Protection Program ("PPP") loan applications to various financial institutions, each of which contained materially false and fraudulent representations. The Fraudulent PPP Applications sought over $14.7 million

from the various financial institutions, resulting in disbursements totaling more than $4.6 million. As to Getten, pursuant to a Plea Agreement, the defendant pleaded guilty to a single count Information of wire fraud, pursuant to 18 USC §371. In the plea agreement, the parties stipulated to an applicable Guidelines range of 18 to 24 months' imprisonment. The base offense level was 6 under U.S.S.G. § 2B1.1(a)(2); there was a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(G) based on the loss amount of $742,599, a three-level decrease for acceptance of responsibility, and a two-level decrease under U.S.S.G. § 4C1.1 because the defendant had zero criminal history points. In criminal history category I, the resulting Guidelines range was 18 to 24 months' imprisonment. On September 12, 2024, Your Honor sentenced Getten to six months' imprisonment to be followed by three years' Supervised Release (Id. at Dkt. 132). The loss amount was much higher than in the instant case with criminal conduct much more sophisticated than that attributable to Joel Babulal. There was also no mitigating role adjustment as there is in the instant case.

As for defendant Baez, pursuant to a plea agreement, she pleaded guilty to one count of misprision of a felony, in violation of 18 U.S.C. § 4. In the plea agreement, the parties stipulated to an applicable Guidelines range of 18 to 24 months' imprisonment. The applicable Guidelines provision for the offense charged in the Information, misprision of a felony, was U.S.S.G. § 2X4.1. However, pursuant to U.S.S.G. § 1B1.2(a), the parties stipulated that the applicable Guidelines provision was U.S.S.G. § 2B1.1. The base offense level is six under U.S.S.G. § 2B1.1(a)(2); there is a 14-level increase under U.S.S.G. § 2B1.1(b)(1)(I) based on the loss amount of $1,047,341; a three-level decrease for acceptance of responsibility; and a two-level decrease under U.S.S.G. § 4C1.1 because the defendant has zero criminal history points. In criminal history category I, the resulting Guidelines range was 18 to 24 months' imprisonment. On February 6, 2025, Your Honor sentenced the defendant to six months imprisonment to be followed by three years' Supervised Release. (Id. at Dkt. 168). Again, the loss amount attributable to Baez was many times higher than that found in the instant case, with criminal conduct much more sophisticated than that attributable to Joel Babulal. There was also no mitigating role adjustment for Ms. Baez either.

Finally, in the related case of *United States v. Donnat Powell*, 23 Cr. 315 (VB), Pursuant to a plea agreement, the defendant pleaded guilty to a single count Information of wire fraud, 18 USC §371. The parties stipulated to a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2), with a 12-level increase under U.S.S.G. § 2B1.1(b)(1)(G) based on the loss amount of $297,213, and a three-level decrease for acceptance of responsibility and two-level reduction for zero-point offender. The defendant's criminal history category was I for a Guidelines range of 12-18 months' imprisonment. On November 16, 2024, the Honorable Vincent L. Briccetti sentenced the defendant to time served to be followed by three years' Supervised Release (Id. at Dkt. 39) The loss amount was much higher than in the instant case with criminal conduct much more sophisticated than that attributable to Joel Babulal. There was also no mitigating role adjustment for Mr. Powell.

Given the sentence imposed on the codefendant and the sentences imposed on the aforementioned defendants involving their much more egregious conduct; with no mitigating role adjustments for any of them; and defendant Joel Babulal's plea of guilty to the single count of §371 conspiracy to possess stolen mail, his minor role in the crime; and lack of substantial criminal history; I submit that any custodial sentence imposed would constitute an unwarranted

sentencing disparity, in addition to being much greater than necessary pursuant to 18 USC §3553(a).

## CONCLUSION

In sum, the defense requested sentence of time served, to be followed by two years' Supervised Release and restitution to the victims would demonstrate leniency, yet also fulfill the goals pursuant to 18 U.S.C. § 3553(a). All of the goals of sentencing would be accomplished, sufficient but not greater than necessary, in order to achieve the aforementioned purposes. I urge the Court to impose such sentence.

Very truly yours,

Tanner & Ortega, L.L.P.

Howard E. Tanner

cc: AUSA Reyhan Watson (By ECF and Email/PDF)
AUSA John Sarlitto (By ECF and Email/PDF)
AUSA James McMahon (By ECF and Email/PDF)